**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Chris Carrigan, Michael Venti, and Sylvain Yelle, individually and as representatives of a class of similarly situated persons, and on behalf of the Xerox Corporation Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Xerox Corporation, the Xerox Corporation Plan Administrator Committee, and John Does 1-30,<br><br>Defendants. | Case No.  3:21-cv-01085 (   )<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**August 11, 2021** |

## NATURE OF THE ACTION

1.     Plaintiffs Chris Carrigan, Michael Venti, and Sylvain Yelle, individually and as representatives of the Class described herein, bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Xerox Corporation ("Xerox"), the Xerox Corporation Plan Administrator Committee (the "Committee"), and John Does 1-30 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Xerox Corporation Savings Plan (the "Plan") in violation of ERISA, to the detriment of the Plan, its participants, and their beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct and obtain appropriate monetary and equitable relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     As of March 2021, Americans had approximately $9.9 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Defined contribution plans have

---

[1] *See* Investment Company Institute, *Retirement Assets Total $35.4 Trillion in First Quarter 2021* (June 16, 2021), *available at* https://www.ici.org/statistical-report/ret_21_q1.

largely replaced defined benefit plans—or pension plans—that were predominant in previous generations.[2] As of March 2020, only around 11% of private sector U.S. workers in the private sector participate in a defined benefit plan.[3] By contrast, approximately 47% of private sector U.S. workers participate in a defined contribution plan.[4]

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has little or no incentive to keep costs low because all risks related to high fees are typically borne by the participating employees.

4.      For certain companies, the potential for imprudent and disloyal conduct is especially high because the plan's fiduciaries can benefit the company through their administration of the plan by, for example, hiring service providers affiliated with the plan sponsor that an unconflicted fiduciary would not have utilized. That was the case with Xerox: shortly after Xerox entered the retirement plan recordkeeping business in the early 2010s,

---

[2] *See* Bankrate, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.
[3] *See* Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: A Fact Sheet*, at 4 (Apr. 30, 2019), *available at* https://fas.org/sgp/crs/misc/R43439.pdf.
[4] *See id.*

Defendants hired Xerox as the Plan's recordkeeper, and passed Xerox's fees, which were well above reasonable market rates, onto the Plan's participants.

5.    To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are the "highest known to law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (1982). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), and exercise appropriate "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B). This includes an obligation to ensure that the expenses of administering the plan are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii).

6.    Contrary to these fiduciary duties, Defendants failed to prudently and loyally oversee the Plan's recordkeeping service provider, and instead used the Plan to promote Xerox's own business interests. From the time Defendants hired Xerox's recordkeeping affiliate, Xerox HR Benefit Services ("Xerox HR"), in 2013 until the time that Defendants belatedly switched to an unaffiliated recordkeeper in 2021, the Plan's recordkeeping expenses more than doubled from $54 per participant in 2013 to $136 per participant by 2019 (the last year for which data is available), all during a period when marketplace rates for defined contribution recordkeeping services were falling dramatically.

7.    Defendants' financial incentive to use the affiliated recordkeeper grew even stronger after Xerox HR was spun off into an independent entity, Conduent HR Services ("Conduent"), as Xerox and its shareholders acquired a material ownership stake in Conduent as part of the spinoff. Despite receiving ample notice of the spinoff and opportunity to find another

recordkeeper or negotiate a favorable deal with the new entity,[5] Defendants retained Conduent as the Plan's recordkeeper for nearly five years after the spinoff despite the Plan's recordkeeping expenses almost doubling immediately after the spinoff was finalized. By retaining the services of an affiliated recordkeeper and failing to engage in a prudent investigation of other service providers in the marketplace, Defendants allowed the Plan to pay as much as *four times* more than what the Plan would have paid in the open market for recordkeeping services of comparable or superior quality. As a result, participants paid millions of dollars per year in excessive fees from 2015 through 2021.

8.      Based on the conduct described herein, Plaintiffs assert claims against Defendants under ERISA for breaches of the fiduciary duties of loyalty and prudence (Count One), and against Xerox for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches and other appropriate relief.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.     This case presents a federal question under ERISA, and therefore this Court has

---

[5] *See* Robert Steyer, *Many Acquisitions Lose Luster Over Time*, PENSIONS & INVESTMENTS, Feb. 20, 2017, *available at* https://www.pionline.com/article/20170220/PRINT/302209993/many-acquisitions-lose-luster-over-time (explaining that sponsors receive significant advance notice of recordkeeper mergers, and have ample opportunity to search for a new recordkeeper and re-negotiate fee levels as part of a formal RFP process before the merger is finalized).

subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

11.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Xerox Corporation Savings Plan is administered, where Defendant Xerox resides, and where a substantial part of the events or omissions giving rise to the claims occurred.

## THE PARTIES

### PLAINTIFFS

12.    Plaintiff Christopher Carrigan resides in Fairport, New York. Plaintiff Carrigan participated in the Xerox Corporation Savings Plan from 1999 until April 2019, when he rolled his account balance over to an IRA. As a Plan participant, his account was recordkept by Xerox HR and Conduent during the class period. Plaintiff Carrigan has been financially injured by Defendants' unlawful conduct which caused him to pay excessive recordkeeping fees. His account would have been worth more when it was rolled over had Defendants not violated ERISA as described herein.

13.    Plaintiff Michael Venti resides in Star, Idaho. Plaintiff Venti participated in the Xerox Corporation Savings Plan from 1998 until November 2020, when he rolled his account balance over to an IRA. As a Plan participant, his account was recordkept by Xerox HR and Conduent during the class period. Plaintiff Venti has been financially injured by Defendants' unlawful conduct which caused him to pay excessive recordkeeping fees. His account would have been worth more when it was rolled over had Defendants not violated ERISA as described herein.

14.    Plaintiff Sylvain Yelle resides in Suwanee, Georgia, and has participated in the Plan since 1994. Plaintiff Yelle is a current participant in the Plan, although he ceased making contributions when his employment with Xerox ended in 1999. Plaintiff Yelle's account balance

in the Plan would be higher had Defendants not violated ERISA as described herein.

## THE PLAN

15.     The Plan was established January 1, 1945.

16.     The Plan covers all eligible U.S. employees and former non-union employees of the Xerox Corporation and participating subsidiaries.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

18.     From 2015 through the end of 2019, the last year for which data is available, the Plan has had between approximately 21,000 and 30,000 participants, and between $3.6 billion and $4.3 billion in assets.

19.     The assets of the Plan are held in a master trust named the Xerox Participant Directed Pool ("Master Trust"). "[A] master trust is a trust for which a regulated financial institution serves as trustee or custodian (regardless of whether such institution exercises discretionary authority or control respecting the management of assets held in the trust) and in which assets of more than one plan sponsored by a single employer or by a group of employers under common control are held." 29 C.F.R. § 2520.103-1(e). The Plan's assets are pooled in the Master Trust with those of the Savings Plan of the Xerox Corporation, a plan with approximately 1,600 participants and $175 million in assets that is not part of the present matter.[6]

20.     Participants in the Plan are responsible for paying expenses associated with administering the Plan and the Master Trust. These fees are charged as a percentage of the

---

[6] The use of a master trust arrangement does not create the need for any additional recordkeeping services, nor does it make provision of recordkeeping services any more complex or time-consuming.

6

employee's assets in the Plan that is added on top of the expense ratio associated with each of the Plan's investments, and thus do not show up on participants' statements as a separate fee they are being charged.

21.    During the class period, the portion of these fees used to pay recordkeeping expenses was paid to three different entities. From 2015 through approximately 2017, fees charged to cover the recordkeeping costs of administering the Plan were paid to Xerox HR Benefits. From approximately 2018 through 2021, the fees associated with recordkeeping services provided to the Plan were paid to Conduent. Finally, for the entire Subject Period, the fees charged to cover recordkeeping expenses associated with administering the Master Trust were paid to Defendant Xerox.

**DEFENDANTS**

***Xerox Corporation***

22.    Xerox is a publicly traded corporation headquartered in Norwalk, Connecticut.

23.    Xerox is identified as the plan sponsor in the Plan's and Master Trust's Form 5500s filed with the DOL.

24.    Xerox, acting through its VP of Human Resources, is responsible for appointing and removing members of the Committee. It is well-accepted that the authority to appoint, retain, and remove other fiduciaries constitutes discretionary authority or control over the management or administration of a plan or trust, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is well-established that the power to appoint plan trustees confers fiduciary status."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying

with ERISA's fiduciary standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Lutz v. Kaleida Health*, 2019 WL 3556935, at *6 (W.D.N.Y. Aug. 5, 2019) ("An appointing fiduciary's duty to monitor [its] appointees is well-established.") (quoting *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005)).

### *Xerox Corporation Plan Administrator Committee*

25.     The Xerox Corporation Plan Administrator Committee is a committee designated by the Plan Document to assist Xerox with administration of the Plan. The Committee is responsible for the general administration of the Plan, including hiring and monitoring service providers such as the Plan's recordkeeper, subject to the ultimate oversight and discretion of Xerox and its senior management. Members of the Committee are appointed by Xerox's Vice President of Human Resources and can be removed by the same. In performance of its duties, the Committee exercises "authority or control respecting management or disposition" of the Plan's assets and has "discretionary authority or discretionary responsibility in the administration" of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A). Further, the Committee is also a named fiduciary by virtue of its position as the designated administrator of the Plan. *See* 29 C.F.R. § 2509.75-8 at D-3.

26.     Each of the Committee members are also fiduciaries under 29 U.S.C. § 1002(21)(A). Because the names of the individual members of the Committee during the class period are currently unknown to Plaintiffs, they are collectively named in this Complaint as John Does 1-30.

27.     Each Defendant identified above as a fiduciary of the Plan is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it participated in the other fiduciaries' breaches, enabled other fiduciaries to breach their fiduciary duties, and/or failed to

remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

28.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of

retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>    (A)    for the exclusive purpose of
>
>        (i)    providing benefits to participants and their beneficiaries; and
>
>        (ii)    defraying reasonable expenses of administering the plan;
>
>    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

29.    These ERISA fiduciary duties are "the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). A fiduciary's conduct "must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (quotation omitted).

### DUTY OF LOYALTY

30.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that [they] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G. Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed.

1980)). "It is part of the fiduciary's obligation to give [beneficiaries] undivided loyalty, free from any conflicting personal interest." *Board of Trustees of Aftra Retirement Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 680 (S.D.N.Y. 2011) (quotation omitted).

### DUTY OF PRUDENCE

31.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). "[A] fiduciary's conduct at all times must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *Sweda*, 923 F.3d at 333 (quotation omitted). "[I]f there is indeed a 'hallmark' of fiduciary activity identified in the statute, it is prudence." *Id.*

### DUTY TO MINIMIZE COSTS

32.    At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quotation omitted).[7]

---

[7] The DOL and SEC have warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2 (2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

33.    Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of the plan's largest expenses.[8] To protect retirement plan participants, ERISA requires the fiduciaries of such plans to monitor administrative expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and *defraying reasonable expenses of administering the plan*[.]") (emphasis added); *Sweda*, 923 F.3d at 328 ("Fiduciaries must … understand and monitor plan expenses."); *accord* Restatement (Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious.").[9]

34.    Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses, including recordkeeping fees, should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (Plaintiffs sufficiently

---

[8] Within the world of defined contribution plans, "recordkeeping" is a catch-all term that describes an array of services provided by a plan's primary administrative service provider that typically includes, but is not limited to, processing and tracking all balances and transactions associated with each participant's account; updating account balances daily; providing a web portal to participants providing them with up-to-date account, investment, and financial planning information; providing communications to participants including periodic account statements and required disclosures; processing participant loans; affording employees various financial education opportunities; compliance testing for the plan; 5500 preparation; preparing financial statements; and furnishing the Plan's fiduciaries with participant and investment information to assist with their administration of the plan.

[9] The legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (citation and internal quotation marks omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

alleged that administrative expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties.") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

35.    A fiduciary may breach its fiduciary duty by authorizing higher-than-market recordkeeping fees or by maintaining a recordkeeping deal for its own benefit or that of a related party. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming judgment against plan sponsor based on "overpaying" recordkeeper and benefiting from the overpayment); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 685 (D. Conn. 2018) (allegations that "the cost of recordkeeping . . . swelled out of proportion to the actual recordkeeping services" due to deficiencies in "monitoring, soliciting competitive bids, negotiating, and selecting a reasonably priced recordkeeper" constitute "quintessential imprudence claims" sufficient to state a fiduciary breach claim).

## DEFENDANTS' VIOLATIONS OF ERISA

**I.    DEFENDANTS FAILED TO PROPERLY MONITOR OR CONTROL THE PLAN'S RECORDKEEPING EXPENSES.**

36.    Defendants caused the Plan's participants to pay excessive recordkeeping expenses during the class period.

37.    Among larger plans, the market for recordkeeping services is highly competitive, with many recordkeepers equally capable of providing a high-level service. Accordingly, recordkeepers vigorously compete for business by offering the best price. As a result of such competition, recordkeeping fees have declined in defined contribution plans over time. Between

2006 and 2016, recordkeeping costs dropped by approximately 50% on a per-participant basis and have continued to decline since then.[10]

38.    Typically, recordkeepers charge for recordkeeping services either on a per-participant fee basis (a fee based on the number of participants in the plan) or as an asset-based fee (a fee based on a percentage of the total assets in the plan).[11] Regardless of how these fees are charged, the cost of these services is typically borne by the plan participants. Accordingly, it is important for plan fiduciaries to closely monitor these expenses to ensure that participants are not being overcharged. *See* DOL Advisory Op. 2013-03A, 2013 WL 3546834, at 4 (July 3, 2013) (noting that fiduciaries must obtain information regarding "all fees or compensation received by" a recordkeeper – "including any revenue sharing" – and assess whether that amount is reasonable for the services provided).

39.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants are highly sought after within the recordkeeping marketplace, and are also able to achieve lower costs on a per-participant basis by taking advantage of economies of scale. However, to achieve these savings, large plans must prudently negotiate lower per-participant recordkeeping fees.

40.    As noted above, the Plan has had between 21,000 and 31,000 participants, and between $3.6 billion and $4.4 billion in assets during the class period. Accordingly, the Plan at

---

[10] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019) *available at* https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC."); Robert Steyer, *Record-keeping Consolidation Expected to Continue*, Pensions & Investments (Oct. 22, 2020) (noting the continued declines in recordkeeping expenses).

[11] Asset-based fee arrangements are more common for smaller defined contribution plans, which have less leverage to negotiate how services are charged.

all times had significant leverage to negotiate competitive rates for high quality recordkeeping services.

41.    Defendants caused the Plan to purchase recordkeeping services from Xerox HR beginning January 1, 2013. Xerox HR was subsequently spun off into Conduent Human Resource Services ("Conduent") in 2017. Conduent served as the Plan's recordkeeper from the time of the spinoff in 2017 until 2021.

42.    Xerox HR was a wholly-owned subsidiary of Xerox and, before it was spun off into Conduent, all of its profits from its retirement plan recordkeeping business immediately accrued to Xerox. Using Xerox HR as the Plan's recordkeeper therefore provided a direct financial benefit to Xerox.

43.    Retaining Conduent as the Plan's recordkeeper after Xerox HR was spun off was also financially beneficial to Xerox. Xerox retained significant equity in Conduent after the spinoff, and thus benefited financially from actions which were beneficial to Conduent. Additionally, Conduent had fewer than 100 defined contribution plan clients as of the time of the spinoff, so the Plan's recordkeeping contract represented a material relationship for Conduent's recordkeeping business.

44.    Based on the Plan's filings with the DOL, the recordkeeping fees for the Plan and Master Trust were approximately $54 per participant in 2013; $66 per participant in 2014; $70 per participant in 2015; $69 per participant in 2016; $123 per participant in 2017; $118 per participant in 2018; and $136 per participant in 2019, the last year for which data is currently available.

45.    Based on Plaintiffs' investigation, from 2015 to the present, a prudent and loyal fiduciary of a similarly sized plan (in terms of participant count) could have obtained comparable

14

recordkeeping services of like or superior quality for $30 to $35 per participant (or possibly lower) from recordkeepers such as Fidelity, Vanguard, Alight, and Empower. Numerous plans of similar size (in terms of participant count)—including those sponsored by Bechtel, WPP Group USA, Kinder Morgan, Nike, Caterpillar, and Henry Ford Health System—paid recordkeeping fees of $35 per participant or less in every year between 2015 and 2019, the last year for which data is available.[12]

46.     A prudent and loyal fiduciary would have closely monitored the Plan's recordkeeping expenses and engaged in a rigorous benchmarking analysis, either on its own or by working with an independent consultant, and would have discovered that the Plan was paying far too much for recordkeeping. Alternatively, the Plan could have performed a request for proposal ("RFP") and discovered that other recordkeepers would have provided the same services at significantly lower cost.

47.     The Plan's excessive recordkeeping expenses demonstrate that Defendants failed to engage in prudent monitoring of the Plan's recordkeeping expenses and engage in prudent practices to keep recordkeeping expenses at competitive levels, and/or that Defendants permitted participants to pay excessive recordkeeping expenses because it was in Xerox's financial interest. Either way, the process by which Defendants managed the Plan's recordkeeping services "would have been tainted by failure of effort, competence, or loyalty," each of which constitutes a "breach of fiduciary duty." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009).

---

[12] In measuring the recordkeeping fees that a prudent fiduciary would pay on a per-participant basis, Plaintiffs are not implying that recordkeeping fees should be charged on a per-person basis, or that they should be charged directly to participants as opposed to being paid through revenue sharing or through an additional investment management fee. Any of these methods of paying for recordkeeping services can be prudent so long as they are arranged by fiduciaries who selected and managed the arrangement loyally and with due care and skill.

Defendants' failure to monitor or control the Plan's recordkeeping expenses cost the Plan's participants millions of dollars during the class period.

## II.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND OTHER MATERIAL FACTS.

48.    Plaintiffs did not have knowledge of all material facts (including, among other things, the cost of the Plan's recordkeeping services compared to similarly-sized plans and the Plan's leverage to negotiate lower recordkeeping expenses) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' process for selecting and monitoring the Plan's recordkeeper and monitoring the Plan's recordkeeping expenses) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

49.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

50.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[13]

> All participants and beneficiaries of the Xerox Corporation Savings Plan ("Plan") at any time from August 11, 2015 until the date that Plan's current

---

[13] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

recordkeeper took over the recordkeeping function in 2021, excluding any persons with responsibility for the Plan's administrative functions or expenses.

51.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 21,000 to 31,000 participants at all relevant times during the applicable period.

52.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are participants of the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with respect to the Plan. Defendants' unlawful actions, omissions, and decisions affected all of the Plan's participants similarly.

53.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

54.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Defendants are fiduciaries with respect to the Plan;

b.    Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

c.    The proper form of equitable and injunctive relief; and

d.    The proper measure of monetary relief.

55.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because

prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

56.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

57.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single proceeding in a single forum.

## **COUNT I**
### **Breach of Duties of Loyalty and Prudence**
### **29  U.S.C. § 1104(a)(1)(A)–(B) (against all Defendants)**

58.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject

to ERISA's fiduciary duties.

59.    29 U.S.C. § 1104 imposes fiduciary duties of loyalty and prudence upon Defendants in connection with their administration of the Plan and the selection and monitoring of the Plan's recordkeeper. The scope of these fiduciary duties and responsibilities includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. *See* 29 U.S.C. § 1104.

60.    Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants caused the Plan to pay excessive recordkeeping fees and failed to properly monitor and control recordkeeping expenses, retaining proprietary recordkeepers because doing so was in Xerox's financial interest. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

61.    Further, each of the actions and omissions described in paragraph 60 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B).

62.    As a consequence of Defendants' fiduciary breaches, the Plan and the participants

in the Plan suffered millions of dollars in losses due to excessive recordkeeping fees.

63.    Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from Defendants' fiduciary breaches. In addition, Defendants are liable for additional relief as provided by ERISA and applicable law.

## COUNT II
### Failure to Monitor Fiduciaries (against Xerox and John Does 1–30)

64.    As alleged throughout the Complaint, Xerox is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

65.    Xerox, acting through its VP of Human Resources, is responsible for appointing and removing the Committee members.

66.    Given Xerox's fiduciary duty to appoint and remove members of the Committee, Xerox had a fiduciary responsibility to monitor the performance of the Committee.

67.    A monitoring fiduciary must ensure that the monitored fiduciaries are adequately performing their fiduciary obligations, including those with respect to the selection and oversight of service providers to the Plan, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

68.    Xerox breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of its appointees' imprudent and disloyal actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c.    Failing to remove appointees whose performance was inadequate in that they

continued to allow the Plan to pay excessive costs for recordkeeping services, to the detriment of the Plan and the retirement savings of the Plan's participants.

69.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees.

70.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Xerox is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify the fiduciary breaches described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Chris Carrigan, Michael Venti, and Sylvain Yelle, as representatives of the Class defined herein and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.    An order compelling Defendants to make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An order granting appropriate equitable monetary relief, including but not limited to disgorgement of profits through a surcharge against Defendants;

F.    An order enjoining Defendants from any further violations of ERISA;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to review or manage the Plan recordkeeping services and expenses, and removal or replacement of the Plan's fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

J.     An award of such other and further relief as the Court deems equitable and just.

Dated:  August 11, 2021                          **GARRISON, LEVIN-EPSTEIN,**
                                                              **FITZGERALD & PIRROTTI, P.C.**

                                                        /s/ *Joseph D. Garrison*
                                                        Joseph D. Garrison (ct04132)
                                                        405 Orange Street
                                                        New Haven, CT  06511
                                                        Tel.: 203-777-4425
                                                        Fax: 203-776-3965
                                                        jgarrison@garrisonlaw.com

                                                        **NICHOLS KASTER, PLLP**
                                                        Paul J. Lukas, MN Bar No. 022084X*
                                                        Kai H. Richter, MN Bar No. 0296545*
                                                        Brock J. Specht, MN Bar No. 0388343*
                                                        Jennifer K. Lee, MN Bar No. 0399012*
                                                        * *pro hac vice* applications forthcoming
                                                        4700 IDS Center
                                                        80 S 8th Street
                                                        Minneapolis, MN  55402
                                                        Tel.: 612-256-3200
                                                        Fax: 612-338-4878
                                                        plukas@nka.com
                                                        krichter@nka.com
                                                        bspecht@nka.com
                                                        jlee@nka.com

                                                        Counsel for Plaintiffs and the proposed Class

22