# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CHRIS CARRIGAN, MICHAEL VENTI, and SYLVAIN YELLE, individually and as representatives of a class of similarly situated persons, and on behalf of the Xerox Corporation Savings Plan, | Civil Action No. 3:21-cv-01085-RNC |
| Plaintiffs, | |
| v. | |
| XEROX CORPORATION, THE XEROX CORPORATION PLAN ADMINISTRATOR COMMITTEE, and JOHN DOES 1-30, | |
| Defendants. | |

## BRIEF OF AMICUS CURIAE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael K. Murray (ct12474)
Jordan Bock (*pro hac vice application forthcoming*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: 617.570.1000
mmurray@goodwinlaw.com
jbock@goodwinlaw.com

Jaime A. Santos (*pro hac vice application forthcoming*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: 202.346.4000
jsantos@goodwinlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

## TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICUS CURIAE ...................................................................... 1

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    This case is one of hundreds of recent cookie-cutter ERISA class actions filed by just a handful of law firms. ............................................................ 3

    II.    There are strong incentives to file ERISA lawsuits in the hopes of extracting large settlements regardless of the merits of the underlying claims. ............................................................................................................ 4

        A.    ERISA complaints often manufacture factual disputes to avoid dismissal. ............................................................................................ 5

        B.    Plan sponsors face substantial pressure to settle if a case survives dismissal. .......................................................................................... 10

    III.    These lawsuits have negative consequences for participants and beneficiaries. ....................................................................................... 11

        A.    These lawsuits pressure plan sponsors to manage plans based solely on cost. ........................................................................................ 11

        B.    These lawsuits lead to increases in liability insurance that adversely impact participants. ................................................................ 12

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................3, 9

*Brown v. Daikin Am., Inc.*,
    No. 18-cv-11091 (PAC), 2021 WL 1758898 (S.D.N.Y. May 4, 2021).........................5, 6, 12

*Conkright v. Frommert*,
    559 U.S. 506 (2010).............................................................................................3, 13

*Cunningham v. Cornell Univ.*,
    No. 16-cv-6525 (PKC), 2018 WL 1088019 (S.D.N.Y. Jan. 19, 2018)...................................11

*DeBruyne v. Equitable Life Assurance Soc'y*,
    920 F.2d 457 (7th Cir. 1990) ...................................................................................5

*Evans v. Akers*,
    534 F.3d 65 (1st Cir. 2008)......................................................................................9

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014).........................................................................................3, 9, 13

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ...................................................................................7

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    No. 15 Civ. 9936 (LGS), 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) ..................................8

*Parmer v. Land O'Lakes, Inc.*,
    518 F. Supp. 3d 1293 (D. Minn. Feb. 9, 2021)............................................................8

*In re RadioShack Corp. ERISA Litig.*,
    547 F. Supp. 2d 606 (N.D. Tex. 2008) ......................................................................8

*Ramos v. Banner Health*,
    461 F. Supp. 3d 1067 (D. Colo. 2020).................................................................7, 11

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)...........................................................................5, 6, 10

*Sweda v. Univ. of Penn.*,
   No. 16-4329, 2017 WL 4179752-GEKP (E.D. Pa. Sept. 21, 2017), *rev'd in part*, 923 F.3d 320 (3d Cir. 2019) ..........................................................................8

*Thompson v. Avondale Indus., Inc.*,
   No. Civ.A.99-3439-AJM, 2000 WL 310382 (E.D. La. Mar. 24, 2000) ..........................8

*White v. Chevron Corp.*,
   752 F. App'x 453 (9th Cir. 2018) .................................................................................9

*White v. Chevron Corp.*,
   No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..........................11

*Wildman v. Am. Century Servs., LLC*,
   362 F. Supp. 3d 685 (W.D. Mo. 2019) .........................................................................11

## Statutes and Regulations

29 U.S.C. § 1104(a)(1)(C) .................................................................................................11

29 U.S.C. § 1104(c) ...........................................................................................................11

29 C.F.R. § 2550.404c-1(b)(3)...........................................................................................11

## Other Authorities

Nevin E. Adams, *Insurance Renewal Contains Excessive Fee Questionnaire*,
   National Association of Plan Advisors (Mar. 9, 2020), https://bit.ly/347vZFY....................13

Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined Contribution Plans*, Euclid Specialty (Dec. 2020), https://bit.ly/3hNXJaW .........1, 4, 6, 12, 13

Jon Chambers, *ERISA Litigation in Defined Contribution Plans*, Sageview
   Advisory Grp. (Mar. 2021), https://bit.ly/2SHZuME ......................................10, 12

Lars Golumbic, et al., *2020 ERISA Litigation Trends Hint At What's Ahead This Year* (Jan. 3, 2021), https://bit.ly/2TeiodS ...............................................................4

Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*,
   Business Insurance (Apr. 30, 2021)..................................................................4, 12

Individual Funds, Thrift Savings Plan, https://bit.ly/3ybcxEK.......................................7

Lockton Financial Services Claims Practice, *Fiduciary Liability Claim Trends*
   (Feb. 2017), https://bit.ly/3viCsd2 .......................................................................10

David McCann, *Passive Aggression*, CFO (June 22, 2016), https://bit.ly/2Sl55Yq ....................12

George S. Mellman and Geoffrey T. Sanzenbacher, *401(k) Lawsuits: What are the Causes and Consequences?*, Center for Retirement Research at Boston College (May 2018), https://bit.ly/3fUxDR1 (documenting the rise in 401(k) complaints from 2010 to 2017)..................................................................................3

Heather Salko, *Litigation Targets Higher Education Retirement Plans*, United Educators, https://bit.ly/3yWhjYm ...............................................................4

Robert Steyer, *Sponsors Rocked by Fiduciary Insurance Hikes*, Pensions & Investments (Sept. 20, 2021), https://bit.ly/39W996Y ........................................4

Thrift Savings Plan, Tex. State Sec. Bd., https://bit.ly/3wE4MXA...........................6, 7

*Understanding the Rapid Rise in Excessive Fee Claims*, AIG, https://bit.ly/3k43kt8 ..............................................................................4

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1 (Sept. 2019), https://bit.ly/3fP8vuH ..............................................................................2

U.S. Dep't of Labor, *Private Pension Plan Bulletin Historical Tables and Graphs 1975-2018* 25 (Jan. 2021), https://bit.ly/36C3pOi ..........................................4

Jacklyn Wille, *401(k) Fee Suits Flood Courts, Set for Fivefold Jump in 2020*, Bloomberg Law (Aug. 31, 2020), https://bit.ly/3fDgjQ5 .......................................4

Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law (Oct. 18, 2021), https://bit.ly/307mOHg..................................4, 12

## INTEREST OF THE AMICUS CURIAE

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.[1]  Many of the Chamber's members maintain or provide services to ERISA-governed retirement plans.  The Chamber regularly participates as amicus curiae in ERISA cases, including those addressing the pleading standard for fiduciary-breach claims.  The Chamber submits this brief to aid the Court's consideration of Defendants' motion to dismiss by providing context on recent trends in ERISA litigation and how this case is situated in the broader litigation landscape.

## INTRODUCTION

This case is one of many in a recent surge of class actions challenging the management of employer-sponsored retirement plans.  This explosion in litigation is not "a warning that retirees' savings are in jeopardy."  Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined Contribution Plans* 3, Euclid Specialty (Dec. 2020), https://bit.ly/3hNXJaW ("*Excessive Fee Litigation*").  To the contrary, "in nearly every case, the asset size of many of these plans being sued has increased—often by billions of dollars"—over the course of the last decade.  *Id.*

The lawsuits typically follow a familiar playbook, often with cookie-cutter complaints that cut and paste pages of identical assertions about the nature of fiduciary obligations, recycling them verbatim from prior pleadings.  Using the benefit of hindsight, these lawsuits second-guess the decisions of plan fiduciaries across the country.  The complaints often point to alternative

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than Amicus, its members, and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

investment or service options available on the market (among tens of thousands of investment options offered in the investment marketplace, and the dozens of service providers who offer their services to plans), and allege that plan fiduciaries *must have* made decisions through a flawed decisionmaking process by not choosing those options for their plan or by not negotiating the fees negotiated by another plan or reported in median fee surveys.  They then try to exploit the perceived complexity of ERISA's statutory scheme to barrel past the motion-to-dismiss stage, after which defendants face the no-win scenario of dealing with expensive and intrusive discovery or settling a case with a large damages request but minimal merit.

No plan, regardless of size or type, is immune from this type of challenge.  It is *always* possible to use hindsight to identify, among the almost innumerable options available in the market, a less-expensive investment option or service arrangement and use that alternative to label the decision made by plan fiduciaries "unreasonable" or the fees negotiated by plan fiduciaries "excessive."  That cannot be enough to open the doors to discovery.

This surge of litigation has significant negative consequences for plan participants.  The suits pressure fiduciaries to limit investments to a narrow range of options at the expense of providing a diversity of choices with a range of fees, fee structures, risk levels, and potential performance upsides, as ERISA expressly encourages.  And given these lawsuits' often single-minded emphasis on cost, fiduciaries may forgo recordkeeping packages that include popular and much-needed financial education, and instead elect only barebones recordkeeping services.  These suits' cost-above-all mantra is directly contrary to the Department of Labor's (DOL) admonition that fees should be only "one of several factors" in fiduciary decisionmaking.  DOL, *A Look at 401(k) Plan Fees* 1 (Sept. 2019), https://bit.ly/3fP8vuH (*401(k) Plan Fees*).

The flood of litigation has also led to a cascade of changes in the insurance marketplace,

inflating insurance costs and making it all-but impossible to obtain adequate insurance coverage. This increased cost—compounded by a significantly increased litigation risk—works to the detriment of employees seeking to save for retirement.  For larger employers, those additional funds must come from somewhere, often in place of more generous employer contributions; for smaller employees, the increased cost and risk could make sponsoring a retirement plan cost prohibitive.  In short, many of these suits will, if successful, simply inflate the costs of establishing and administering a plan—something that is entirely voluntary.  That is precisely what Congress sought to avoid in crafting ERISA.  *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

Given this context, and the relative ease of cherry-picking data in an attempt to manufacture a factual dispute involving literally any plan, it is critical that courts do not shy away from the "careful, context-sensitive scrutiny of [the] complaint's allegations" the Supreme Court has instructed courts to undertake in ERISA cases.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  When a plaintiff does not present any direct allegations of wrongdoing but instead relies entirely on circumstantial allegations that are "just as much in line with" plan fiduciaries' having acted through a prudent fiduciary process, dismissal is appropriate.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

**ARGUMENT**

**I.    This case is one of hundreds of recent cookie-cutter ERISA class actions filed by just a handful of law firms.**

The last 15 years have seen a surge of ERISA litigation.[2]  What began as a steady increase has exploded in the past 18 months, culminating in over 100 excessive-fee suits in 2020—a five-

---

[2] *See, e.g.*, George S. Mellman and Geoffrey T. Sanzenbacher, *401(k) Lawsuits:  What are the Causes and Consequences?*, Center for Retirement Research at Boston College (May 2018), https://bit.ly/3fUxDR1 (documenting the rise in 401(k) complaints from 2010 to 2017).

fold increase over the prior year—and many additional lawsuits filed this year.[3]

Like this case, many of these challenges allege that plan fiduciaries breached their fiduciary duties under ERISA by failing to select lower-cost or higher-performing investment options or failing to control recordkeeping costs. *See, e.g.*, Compl. ¶ 36. These claims do not reflect a change in plan management in these areas; to the contrary, they "attack … commonplace and longstanding" retirement-plan practices. *Excessive Fee Litigation* 3.

Given the number of employer-sponsored retirement plans, there is an almost endless supply of possible defendants.[4] While large 401(k) plans sponsored by Fortune 500 companies were initially the focus of this litigation, these lawsuits have recently expanded to new territory, including non-profits like the Red Cross,[5] universities,[6] hospitals and health systems whose resources are particularly stressed in the pandemic environment,[7] and small companies.[8]

## II. There are strong incentives to file ERISA lawsuits in the hopes of extracting large settlements regardless of the merits of the underlying claims.

The widespread proliferation of ERISA class-action lawsuits can be attributed in large part

---

[3] *See Understanding the Rapid Rise in Excessive Fee Claims* 2, AIG, https://bit.ly/3k43kt8 ("*Rapid Rise in Excessive Fee Claims*"); *see also* Jacklyn Wille, *401(k) Fee Suits Flood Courts, Set for Fivefold Jump in 2020*, Bloomberg Law (Aug. 31, 2020), https://bit.ly/3fDgjQ5.

[4] There are 588,499 401(k) plans in the United States. DOL, *Private Pension Plan Bulletin Historical Tables and Graphs 1975-2018* 25 (Jan. 2021), https://bit.ly/36C3pOi.

[5] Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*, Business Insurance (Apr. 30, 2021), https://bit.ly/3ytoRBX ("*Hardening Fiduciary Liability Market*").

[6] Heather Salko, *ERISA Litigation Targets Higher Education Retirement Plans*, United Educators, https://bit.ly/3yWhjYm (describing "wave" of lawsuits filed against more than a dozen universities by a single firm).

[7] *See, e.g.*, *Holmes v. Baptist Health S. Fla., Inc.*, No. 1:21-cv-22986-RNS (S.D. Fla.), ECF No. 1 (filed Aug. 17, 2021); *Garnick v. Wake Forest Univ. Baptist Med. Center*, No. 1:21-cv-00454-WO-JLW (M.D.N.C.), ECF No. 1 (filed June 4, 2021).

[8] *See* Lars Golumbic, et al., *2020 ERISA Litigation Trends Hint At What's Ahead This Year*, Law360 (Jan. 3, 2021), https://bit.ly/2TeiodS ("The biggest driver of the explosion of ERISA class actions in 2020 was a dramatic increase in the number of smaller plans facing these lawsuits . . . ."); *see also Rapid Rise in Excessive Fee Claims* 2; Robert Steyer, *Sponsors Rocked by Fiduciary Insurance Hikes*, Pensions & Investments (Sept. 20, 2021), https://bit.ly/39W996Y ("*Fiduciary Insurance Hikes*") (noting that 20% of the excessive-fee suits filed from January 2020 to August 2021 were filed against plans with under $500 million in assets); Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law (Oct. 18, 2021), https://bit.ly/307mOHg ("*Spike Scrambles Insurance Market*") (quoting an industry analyst's assessment that "[e]xposure is metastasizing" and plaintiffs are moving "more down market … to smaller plans").

to two related factors.  First, ERISA's perceived complexity is often used as a justification for evading dismissal, regardless of the quality of the allegations.  Second, given the cost of discovery and the inflated damages figures advanced by plaintiffs' experts, there is often substantial pressure to settle if a case survives dismissal—again, regardless of the merits.

### A.    ERISA complaints often manufacture factual disputes to avoid dismissal.

The shared problem with these lawsuits is exemplified by a feature that appears in the vast majority of the complaints.  They typically compare the fees of the investment options in the plan or the fees paid to service providers of the plan to various alternative options available on the market that allegedly out-performed or had lower fees than the plan's options during a cherry-picked time period.  *See, e.g.*, Compl. ¶¶ 44-45.  They then ask the Court to infer that plan fiduciaries must have been asleep at the wheel and request discovery to prove it.  This approach is both legally and factually flawed:  legally flawed because it employs the wrong standard for evaluating prudence, and factually flawed because it is all too easy to manipulate data to make any plan look supposedly mismanaged.

Courts have long recognized that ERISA "requires prudence, not prescience."  *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990).  As a result, the "central aim of ERISA's investment prudence standard is to police the *means* by which fiduciaries carry out their duties, and not to scrutinize the *substantive outcomes* of their decisions."  *Brown v. Daikin Am., Inc.*, No. 18-cv-11091 (PAC), 2021 WL 1758898, at *6 (S.D.N.Y. May 4, 2021).  These lawsuits, in contrast, typically rest on allegations that focus entirely on *substantive outcomes*, such as investment performance or compensation arrangement judged "from the vantage point of hindsight."  *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013).

Like plaintiffs' claims here, challenges to service-provider arrangements also rest on a

misconception "that all recordkeepers provide exactly the same service for all plans." *Excessive Fee Litigation* 6.  To the contrary, "[e]ven plans that have an identical number of participants and the same total plan assets may have very different service models." *Id.*  When a recordkeeper is, for example, "not only an administrative services provider, but also an investment manager for several of [a plan's] investment funds," it "only make[s] sense that the fees it charge[s] … exceed those charged by a simple administrative services provider." *Brown*, 2021 WL 1758898, at *8.  In other words, while many of these complaints suggest that any variation in fees—or any fee in excess of a seemingly arbitrary level, typically $30 or $35 per participant—is essentially *per se* evidence of a fiduciary breach, fees *should* vary among plans because services vary among plans. *Id.*  If, however, simply alleging that a plan has higher recordkeeping fees than some arbitrarily chosen moving target, or some other plan, is sufficient to state a fiduciary-breach claim, then every plan's fiduciaries will be encouraged to prioritize cost above all else—even if that means abstaining from innovative services (like financial-wellness education, web-based financial tools, and even enhanced customer-service options) from which their participants would benefit.

This oversimplified cost-comparison approach is particularly problematic because it is all too easy to cherry-pick historical data to make a fiduciary's choices look suboptimal given the effectively infinite combination of alternative investment or service options available during any given time period.  Take the federal Thrift Savings Plan ("TSP"), typically held out as the "gold standard" for retirement plans, and regularly used by plaintiffs as a comparator to argue that an investment underperformed or had excessive fees.  *See, e.g.*, *Brotherston v. Putnam Invs., LLC*, Appellants' Br., No. 17-1711, 2017 WL 5127942, at *23 (1st Cir. Nov. 1, 2017) (describing TSP as "a quintessential example of a prudently-designed plan"); *see also* Thrift Savings Plan, Tex. State Sec. Bd., https://bit.ly/3wE4MXA ("The TSP is considered the gold standard of 401(k)s

because it charges extremely low fees and offers mutual funds that invest in a cross-section of the

stock and bond markets.").[9]  Even the TSP could be made to look like a mismanaged plan by

cherry-picking comparators with fees that are significantly lower than the TSP's[10]:

| Fund | Total Expense Ratio |
|---|---|
| *TSP Fixed Income Index Investment Fund (F Fund)* | 0.06% |
| iShares Core US Aggregate Bond ETF | 0.04% |
| Vanguard Total Bond Market Index Fund (Institutional Plus Shares) | 0.03% |
| | |
| *TSP Common Stock Index Investment Fund (C Fund)* | 0.051% |
| Fidelity 500 Index Fund | 0.015% |
| iShares S&P 500 Index Fund (Class K) | 0.030% |
| | |
| *TSP Small Cap Stock Index Investment Fund (S Fund)* | 0.068% |
| Fidelity Extended Market Index Fund | 0.036% |

When one zeroes in on a single metric for comparison—in the above example, fees—it will

*always* be possible to find a supposedly "better" fund among the thousands on the market.  But

this is not a plausible sign of imprudence—fees are only "one of several factors" fiduciaries

consider.  *401(k) Plan Fees* 1.  In the retirement-plan context, as elsewhere, "cheaper is not

necessarily better."  *Id.*  Thus, "nothing in ERISA requires every fiduciary to scour the market to

find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."

*Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).

These complaints also frequently compare apples and oranges:  comparing the performance

of Fund A with one investment style and performance benchmark with that of Fund B, which has

a demonstrably different investment style and performance benchmark.  *See, e.g.*, *Ramos v. Banner

Health*, 461 F. Supp. 3d 1067, 1108 (D. Colo. 2020) (rejecting plaintiffs' reliance on "inapt

---

[9] The TSP is a particularly inapt exemplar given that the U.S. government subsidizes administrative and investment-management expenses, thereby inflating the net-of-fees performance of the plan's investment options.
[10] The data for this table was drawn from the TSP website.  *See* Individual Funds, Thrift Savings Plan, https://bit.ly/3ybcxEK (results last updated Dec. 31, 2020).

comparators"); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. Feb. 9, 2021) (rejecting "apples to oranges" comparisons offered by plaintiff's complaint, which compared "blended strategy funds" with varying "strategies, aims, risks, and potential rewards" to "wholly passive" alternatives).   And one complaint's supposedly imprudent choice is often another complaint's prudent exemplar.   For example, earlier this year, Henry Ford was hit with an ERISA class action alleging that plan fiduciaries breached their duty of prudence by negotiating "excessive" recordkeeping fees.   *See* Compl. ¶¶ 157-167, *Hundley v. Henry Ford Health System*, No. 2:21-cv-110233 (E.D. Mich.), ECF No. 1.   But the complaint here holds up *this exact plan* as an example of "prudent and loyal" fiduciary decisionmaking with respect to recordkeeping fees. Compl. ¶ 45.   Similarly, General Electric was sued in 2017 for including the GE RSP U.S. Equity Fund, among others, in its 401(k) plan.   *See* Compl. ¶ 1, *Haskins v. Gen. Elec. Co.*, No. 3:17-cv-01960-CAB-BLM (S.D. Cal.), ECF No. 1.   But a different case held up *this exact fund* as a "superior performing alternative[]" to the funds in another plan.   Compl. ¶ 122, *Harding v. Southcoast Hosps. Grp.*, No. 1:20-cv-12216-LTS (D. Mass.), ECF No. 1.

As these complaints demonstrate, ERISA fiduciaries making discretionary decisions are at risk of being sued seemingly no matter what decision they make.   They are sued for failing to divest from risky or dropping stock,[11] or for failing to *hold onto* such stock because high risk can produce high reward.[12]   They are sued for offering more than one investment option in the same style,[13] while others complain that including *only one option* in each investment style is

---

[11] *See, e.g.*, *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008).

[12] *E.g.*, *Thompson v. Avondale Indus., Inc.*, No. Civ.A.99-3439-AJM, 2000 WL 310382, at *1 (E.D. La. Mar. 24, 2000).

[13] *See, e.g.*, *Sweda v. Univ. of Penn.*, No. 16-4329-GEKP, 2017 WL 4179752, at *10 (E.D. Pa. Sept. 21, 2017), *rev'd in part*, 923 F.3d 320 (3d Cir. 2019).

imprudent.[14]  In many cases they are sued for failing to offer Vanguard mutual funds,[15] while in others they are sued *because they offered* Vanguard mutual funds.[16]  And in some instances, fiduciaries have simultaneously defended against "diametrically opposed" theories of liability, giving new meaning to the phrase "cursed-if-you-do, cursed-if-you-don't."[17]

Given the malleability in the data, this "inference through cherry-picked comparisons" approach hardly provides a basis for stating a claim for breach of fiduciary duties.  When a complaint lacks direct factual allegations of key elements of a civil claim, the Supreme Court has instructed lower courts to rigorously analyze the circumstantial allegations to determine whether they plausibly suggest wrongdoing or are instead "just as much in line with" lawful behavior. *Twombly*, 550 U.S. at 554.  Complaints in the latter category fail Rule 8(a)'s plausibility requirement and must be dismissed. *Id.* at 567.  That rigorous analysis is particularly important in ERISA cases, where the Supreme Court has specifically instructed courts to apply "careful, context-sensitive scrutiny" in order to "divide the plausible sheep from the meritless goats." *Fifth Third*, 573 U.S. at 425; *see also White v. Chevron Corp.*, 752 F. App'x 453, 454-455 (9th Cir. 2018) (applying *Twombly* and affirming dismissal of ERISA complaint alleging excessive fees).

Moreover, that fiduciaries did not select what turned out to be the lowest-cost option does not suggest that the cherry-picked comparators in a complaint were in fact "better" overall (even in hindsight).  Indeed, there will always be a plan with lower administrative expenses and a plan— typically many plans—with higher expenses, just as there will always be a fund that performs better and a fund—typically many funds—that perform worse.  There is no one prudent fund,

---

[14] *See, e.g.*, Am. Compl. ¶ 52, *In re GE ERISA Litig.*, No. 17-cv-12123-IT (D. Mass.), ECF No. 35.
[15] *See, e.g.*, *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016).
[16] *See, e.g.*, Am. Compl. ¶ 108, *White v. Chevron Corp.*, No. 16-cv-0793-PJH (N.D. Cal.), ECF No. 41.
[17] *E.g.*, *Evans v. Akers*, 534 F.3d 65, 68 (1st Cir. 2008).

service provider or fee level that renders everything else imprudent.  Instead, there is a wide range of reasonable options, and Congress vested fiduciaries with flexibility and discretion to choose from among those options based on their informed assessment of the needs of their particular plan.

**B.    Plan sponsors face substantial pressure to settle if a case survives dismissal.**

Once a court denies a motion to dismiss, the defendant must face discovery—which, for these types of suits, is entirely asymmetrical and can easily run in the millions of dollars for an ERISA defendant.  *See* Lockton Financial Services Claims Practice, *Fiduciary Liability Claim Trends* 1 (Feb. 2017), https://bit.ly/3viCsd2.  "[T]he prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times."  *St. Vincent*, 712 F.3d at 719.  While discovery is, of course, sometimes "appropriate," the cost of discovery (financial and otherwise) "elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal real evidence.'"  *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  And once one plan sponsor decides to settle, it makes it more difficult for other sponsors with similar plans to resist.  *See* Jon Chambers, *ERISA Litigation in Defined Contribution Plans* 9-10, Sageview Advisory Grp. (Mar. 2021), https://bit.ly/2SHZuME.

Moreover, ERISA lawsuits are generally not filed simply against the employer, but also against the individual fiduciaries who served on particular committees during the relevant time period.  Increasingly, dozens of individuals have found themselves named as class-action defendants (from every member of a defendant's board of directors to lower-level human-resources personnel)—even if they have a demonstrably tangential relationship to the plan.  *See, e.g.*, Am. Compl. ¶¶ 32, 36, 40, 45, *In re GE ERISA Litig.*, No. 17-cv-12123-IT (D. Mass.), ECF

No. 54 (naming over 60 individual defendants occupying various roles with the company).  As courts have noted, this has "the tremendous power to harass" individual defendants and is likely to increase the pressure on employers to settle—particularly because these defendants are forced to disclose "the lawsuit on every auto, mortgage or student financial aid application they file." *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2018 WL 1088019, at *1 (S.D.N.Y. Jan. 19, 2018).

Defendants continue to face significant settlement pressure even after discovery. Regardless of the merits of the underlying claims, proceeding to trial is often risky as defendants are frequently staring down astronomical damages figures that outstrip their annual plan contributions.  *See, e.g.*, *Ramos*, 461 F. Supp. 3d at 1079, 1081 (plaintiffs sought $85 million in damages from employer that made $71 million in annual contributions).  These damages calculations can be highly suspect—as courts have recognized in the few cases that went to trial. *See, e.g.*, *id.* at 1108-1109 (throwing out plaintiffs' damages model as "unreliable" where plaintiffs' expert "relied almost exclusively on his unquantifiable and non-replicable experience"); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 710-711 (W.D. Mo. 2019) (cataloguing extensive flaws in plaintiffs' damages model).  But the risk that a district court might nevertheless accept these calculations is often too great for defendants to bear.

## III.    These lawsuits have negative consequences for participants and beneficiaries.

### A.    These lawsuits pressure plan sponsors to manage plans based solely on cost.

The pressure created by these suits undermines one of the most important aspects of ERISA—the value of innovation, diversification, and employee choice.  ERISA *requires* diversification.  *See* 29 U.S.C. § 1104(a)(1)(C).  And DOL regulations require plans to offer at least three options with *different* risk and return characteristics to qualify as participant-directed plans under 29 U.S.C. § 1104(c), which shields fiduciaries from liability for losses that result from

participants' control over their investment allocations.  *See* 29 C.F.R. § 2550.404c-1(b)(3).

But these types of lawsuits often take a cost-above-all approach, alleging imprudence any time fiduciaries take into account considerations other than cost—notwithstanding ERISA's direction to do precisely that.  *See White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *10 (N.D. Cal. Aug. 29, 2016).  These suits affect the recordkeeping services fiduciaries select, pushing plan sponsors toward the lowest-cost option, which DOL has acknowledged may not be the best one.  *See 401(k) Plan Fees* 1.  An investment committee may, for example, feel pressured by the threat of litigation to offer only "a diversified suite of passive investments," despite "actually think[ing] that a mix of active and passive investments is best." *See* David McCann, *Passive Aggression*, CFO (June 22, 2016), https://bit.ly/2Sl55Yq (lawsuits push fiduciaries toward the "lowest-cost fund," which is not always "the most prudent" option). In a purported effort to safeguard plaintiffs' retirement funds, these lawsuits pressure fiduciaries *away from* exercising their "responsibility to weigh … competing interests and to decide on a (prudent) financial strategy."  *Brown*, 2021 WL 1758898, at *7.

### B.  These lawsuits lead to increases in liability insurance that adversely impact participants.

The litigation surge has also upended the insurance industry for retirement plans.  *See Hardening Fiduciary Liability Market*.  The risks of litigation have pushed fiduciary insurers "to raise insurance premiums, increase policyholder deductibles, and restrict exposure with reduced insurance limits."  *Excessive Fee Litigation* 4; *see also Spike Scrambles Insurance Market* (discussing the "sea change" in the market for fiduciary insurance); *Fiduciary Insurance Hikes*. Plans are now at risk of not being able to "find[] adequate and affordable fiduciary coverage because of the excessive fee litigation."  *Excessive Fee Litigation* 4; *see also* Chambers, *ERISA Litigation in Defined Contribution Plans* 1 (fiduciary insurers may "increasingly move to reduce

coverage limits, materially increase retention, or perhaps even cancel coverage"). Indeed, some insurers now require plans to disclose "any inquiries from" specific law firms "regarding any topic whatsoever," and whether they know of "any 'online/social media solicitation of [their] employees to contact a law firm about their defined contribution plan fees or investments.'" Nevin E. Adams, *Insurance Renewal Contains Excessive Fee Questionnaire*, National Association of Plan Advisors (Mar. 9, 2020), https://bit.ly/347vZFY; *see also Fiduciary Insurance Hikes* (noting the trend of insurers asking "potential and existing clients about any contact with law firms active in ERISA litigation"). These questionnaires also probe whether plans have specific features that have been the subject of recent litigation, compounding the pressure on sponsors to narrow the choices available to plan participants. *See Fiduciary Insurance Hikes*.

If employers need to absorb the cost of higher insurance premiums and higher deductibles—in addition to attorneys' fees and settlement costs not funded by insurance—then many employers will inevitably have to offer less generous plans—reducing their employer contributions, declining to voluntarily cover administrative fees, and reducing the services available to employees. And while large employers may have some capacity to absorb some of these costs, many smaller employers do not. If smaller plan sponsors "cannot purchase adequate fiduciary liability insurance to protect their plan fiduciaries, the next step is to stop offering retirement plans to their employees." *Excessive Fee Litigation* 4. This outcome is wholly at odds with a primary purpose of ERISA—to *encourage* employers to voluntarily offer retirement plans. *See Conkright*, 559 U.S. at 517.

## CONCLUSION

For the foregoing reasons, adopting anything less than the "careful . . . scrutiny" of ERISA complaints prescribed by the Supreme Court in *Fifth Third* would create precisely the types of

negative consequences that Congress intended to avoid in crafting ERISA.  Amicus urges the Court

to adopt and apply that level of scrutiny to this case.

Dated: November 9, 2021                    Respectfully submitted,

                                           /s/ *Michael K. Murray*
                                           Michael K. Murray (ct12474)
                                           Jordan Bock (*pro hac vice application
                                           forthcoming*)
                                           GOODWIN PROCTER LLP
                                           100 Northern Avenue
                                           Boston, MA 02210
                                           Telephone: 617.570.1000
                                           Fax: 617.523.1231
                                           mmurray@goodwinlaw.com
                                           jbock@goodwinlaw.com

                                           Jaime A. Santos (*pro hac vice application
                                           forthcoming*)
                                           GOODWIN PROCTER LLP
                                           1900 N Street, NW
                                           Washington, DC 20036
                                           Telephone: 202.346.4000
                                           Fax: 202.346.4444
                                           jsantos@goodwinlaw.com

                                           *Counsel for Amicus Curiae the Chamber of
                                           Commerce of the United States of America*

14

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Connecticut by using the court's CM/ECF system on November 9, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: November 9, 2021

*/s/ Michael K. Murray*
Michael K. Murray (ct12474)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: 617.570.1000
Fax: 617.523.1231
mmurray@goodwinlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*